This is an appeal from the judgment of the Ottawa County Court of Common Pleas which granted appellees' motions for summary judgment. For the reasons that follow, we reverse the decision of the trial court.
Donald R. Bower was driving a vehicle on County Road 59, Bolander Road, in front of White Rock Quarry ("the quarry"). Appellant, Derek O'Neal, was a passenger in Bower's vehicle, a 1991 Honda CRX. Bower lost control of his vehicle and rolled it over in an adjacent field. O'Neal was ejected from the vehicle and was severely injured. A second car, a 1985 Pontiac Grand Am, driven by Jeremy Furden, was also on the road at the time of the accident. Both vehicles were traveling northbound on Bolander.
At the point where Bower lost control of his vehicle, there was an accumulation of stone and gravel approximately an inch in height spanning the width of the road coming out from the quarry's exit driveway. Also in the area was a pothole and a depression. Robert Long described the depression as having a depth of six inches at the edge of the road which gradually decreased to nothing at the center of the road, and a length of approximately five to six feet from the edge of the road to the center of the road. No dimensions were given regarding the width of the depression.
Robert Long, who could see the accident site from his backyard, coincidentally worked for Cincinnati Insurance Company, which was the Bowers' insurer. Initially, Long was assigned the case by Cincinnati, during which time he measured the depression and took pictures of the area. However, Long eventually declined to handle the case. Long testified in his deposition that the depression had existed the entire ten months that he had lived in his house and that the condition of the depression never seemed to get worse. He further testified that he would drive on the other side of the road to avoid the depression and that he would drive at approximately thirty-five m.p.h. on the road because of its condition. Speaking about the area in front of the quarry, Long stated, "The car would weave a little as you came out of there, combination of the depression and the loose stone on the roadway."
Richard Stevens, an accident reconstructionist, and appellants' expert, reported that Bower lost control of his vehicle as a result of the depression and gravel in the area. Stevens stated the following in his report:
 "* * * The physical evidence at the scene indicated that the north-bound Honda began to lose control at the point where the heavy accumulation of gravel is located. The Honda was north-bound in the north-bound lane when it encountered the hole in the road and the gravel build up. The combination of the hole in the road, and the accumulated gravel, served to make the traveled portion of the road very hazardous. The Honda would have entered the hole in the road first causing the vehicle to unload the front suspension as it exited, thus reducing traction to the front driving wheels. A front wheel drive vehicle is especially sensitive to a loss of traction due to a condition known as torque steer. Torque steer will cause a front wheel drive vehicle to veer suddenly in one direction or the other depending on which wheel has the traction. This condition is exaggerated when the loss of traction occurs at speed or during acceleration. This condition is more dangerous at speed due to the fact that when a wheel looses traction while rotating at a high rate of speed it will rapidly increase it's rotational speed to a speed greater than the vehicle's road speed. * * *
 "It is my opinion that the proximate cause of this crash was the loss of lateral stability of the drive wheels on Donald Bower's Honda due to the poor road conditions in front of the exit drive from White Rock Quarries. The road hazards consisted of a large cave-in on the west side of the pavement and a large build up of gravel covering the general area. All of the physical evidence indicated that Donald Bower's Honda lost control as it encountered the hazards at the exit drive for White Rock Quarries. Given the above set of circumstances, Donald Bower was powerless to recover control of his vehicle once it began to swerve and run off the right side of the road."
Also pertinent to this case was the witnesses' testimony that Bower and Furden were traveling very fast down Bolander and were potentially engaged in a drag race or speed contest at the time of the accident. Although nobody saw the cars at the precise moment Bower lost control, the cars were observed moments beforehand.
Robert Long lived on Reiman Road, near the accident site. Long testified that he was coming home heading north on Reiman at Martin Moline Road when he noticed two cars make a left turn onto Reiman. Long testified that the cars were ten to fifteen feet apart and took the turn at about thirty-five to forty m.p.h. Long further testified that approximately five minutes had passed from the time he saw the cars turn onto Reiman to the time he saw, from his backyard, the cloud of dust on Bolander and the car flipping through the field.
Wayne Vogel, a local farmer who was plowing a field near the accident site, did not witness the accident, but did observe the vehicles five minutes beforehand racing southbound on Bolander. Vogel testified that he saw the vehicles turn from Trowbridge to Bolander, stop, back up, get side by side and accelerate at the same time. He lost sight of them after they passed the quarry entrance. Vogel further testified that their speed was excessive, "faster than the speed limit," and that he had no doubt they were racing.
Daniel Newton, quarry employee, was working on the quarry's railroad tracks on the day of the accident. He observed the vehicles heading south on Bolander. Newton testified that both cars accelerated at the same time after a hand signal, with a squeal of the tires, and with the front ends coming up a little bit. The car that eventually crashed, Bower's vehicle, was in the northbound lane heading south. Newton watched them proceed south on Bolander to the railroad tracks where they hit their brakes and followed each other over the tracks. Newton estimated the cars' speeds at forty to fifty m.p.h. Newton also testified that he next saw them as they passed him heading north on Bolander. Bower's vehicle was in the northbound lane. Newton estimated their speed at fifty to sixty m.p.h. Newton lost sight of them at the quarry entrance (which is south of the exit drive) just prior to the accident. Newton backed up the railroad cars to see what happened because "[i]f they were * * * racing, [he] figured they would end up down the road[,] up the hill or something." Newton testified that he spoke with Furden when he hollered out to Furden that racing up and down the road was pretty stupid. Newton stated that Furden "had some smart comment" about how he was not racing:
"Q. And what was that comment?
 "A. I don't know for sure, but I remember something that he was being smart, like they weren't racing; and I'm like, I know better than that, because I can see what you guys were doing."
Fred Jensen, the quarry's superintendent at the time of the incident, testified that he was in an office facing Bolander Road when he observed two vehicles heading north on Bolander. Jensen testified that the cars were going "faster than normal" for traffic on that road and that the cars were going "considerably" faster than forty m.p.h. Although the cars were side by side with the front of one being even with the driver's door of the other, he did not conclude that the cars were drag racing. He did, however, testify that he was concerned that the cars would not be able to negotiate the curve at the end of the road, three-tenths of a mile from where Jensen observed the vehicles. Jensen and Larry Ennis, in whose office Jensen was, ran outside to check on the cars, but the accident had already occurred before even reaching the curve. Jensen further testified that he had asked Furden why they were drag racing. Jensen testified that Furden "said he was trying to pass him." Later in the questioning Jensen indicated that he understood Furden to mean that Bower was passing Furden.
There were no depositions or affidavits from either O'Neal, Bower, or Furden. Deputy Sheriff Randy Riedmaier testified that Furden stated he was in the northbound lane and that Bower started to pass him. Riedmaier further testified that Furden stated that he noticed in his mirror, as the front of Bower's vehicle came alongside the rear of his vehicle, that Bower's vehicle was swerving and out of control. Despite Furden's statements, Riedmaier testified that he believed Bower and Furden were engaged in a speed contest. With respect to the cause of the accident, Riedmaier testified that he found unsafe speed to be a contributing factor. With respect to the condition of the road, Riedmaier testified that it would not have created a dangerous condition for someone going at or below the speed limit.
Furden was the only person who even allegedly stated that Bower and he were not drag racing. However, Furden's statements are hearsay and are not proper Civ.R. 56(E) evidence. Moreover, Furden's statements, if admissible, would put Bower in the opposite lane, i.e., the southbound passing lane, where no depression existed.
A number of civil suits arose as a result of this incident in both Ottawa and Wood County Common Pleas Courts. Eventually, all matters in dispute were consolidated under Case No. 96-CVC-347 in Ottawa County Court of Common Pleas. The suits involved the following parties: appellants, Derek O'Neal and his parents, David O'Neal and Kimberly Wineland; insurance companies; the drivers of both vehicles, Bower and Furden; the drivers' parents; and appellees, Steve Arndt, president of the Ottawa County Board of Commissioners, John Papcun, Ottawa County Engineer, and White Rock Quarry. All parties either settled and/or were dismissed by the plaintiffs, except for appellees.
Appellants averred that Derek was injured as a result of Bower and Furden operating "their motor vehicles at excessive rates of speed and/or * * * drag-racing on CR-59/Bolander Road." Appellants also averred that Arndt and Papcun were liable for Derek's injuries because they breached their duty, pursuant to R.C. 2744.02(B)(3), to keep the public roads in repair and free from nuisance. With respect to the quarry, appellants averred that it was liable for negligently damaging Bolander Road and allowing rocks to accumulate on the road. Appellees were granted summary judgment by the Ottawa County Court of Common Pleas.
Appellants appealed the decision of the trial court and raise the following assignments of error:
"STATEMENT OF ASSIGNMENTS OF ERROR
 "I. THE TRIAL COURT ERRED IN GRANTING APPELLEE WHITE ROCK QUARRY'S MOTION FOR SUMMARY JUDGMENT
 "II. THE TRIAL COURT ERRED IN GRANTING THE MOTION, FOR SUMMARY JUDGMENT OF APPELLEES STEVE ARNDT AND JOHN PAPCUN"
The issues raised in the quarry's motion for summary judgment are the same issues raised on appeal. The quarry asserted in its motion for summary judgment, filed May 15, 1998, that it had no statutory or other common law responsibility to repair or maintain the roadway; rather, it asserted that road repair was the responsibility of Ottawa County. Furthermore, the quarry asserted that the quarry did not through any "affirmative act" create the road conditions because any gravel on the roadway or damage to the roadway was caused by trucks owned or operated by individual customers or private brokers, and not the quarry. The quarry asserts on appeal that there is no authority for appellants' argument that, because the quarry swept the road, it had a continuing obligation to do so.
Appellants responded, however, that the road hazards encountered by Bower on the day of the accident, i.e., stone/gravel and pothole/depression, were caused by the quarry. Appellants argue on appeal that these roadway hazards were created for the benefit of the quarry because they were caused by truck traffic entering and exiting the quarry for the purpose of hauling stone out of the quarry. Due to the hazards it was creating, appellants further argued in response to summary judgment that the quarry assumed the duty of maintaining the road by inspecting its condition daily, sweeping it off as needed and occasionally patching.
The trial court granted the quarry's motion for summary judgment on September 4, 1998. The trial court held that an adjacent landowner generally has no duty to keep streets and sidewalks open, in repair, and free from nuisance unless:
 "(1) a statute or ordinance imposes on the landowner a specific duty to keep the sidewalk in good repair; (2) by affirmative acts the landowner created or negligently maintains the dangerous condition; or (3) the landowner negligently permits the dangerous condition to exist for some private use or benefit." Citing Crowe v. Hoffman (1983), 13 Ohio App.3d 254, 255-56.
The trial court recognized that there was no statute requiring the quarry to keep the street in repair and that, in fact, it was the duty of the municipality to keep the street in safe repair. With respect to the quarry negligently permitting the dangerous condition to exist for some private use or benefit, the trial court found that "in direct opposition to permitting the danger to exist, the testimony of workers of the Quarry state that they would try and sweep the road of stones when it got to be too much" and would patch holes at the quarry's entrance. As such, the trial court held that appellants "presented no evidence whatsoever to show that the Quarry was somehow negligent in allowing this condition to exist." With respect to whether the quarry, through any "affirmative acts," either "created or negligently maintained the condition of the road," the trial court held:
 "* * * As previously noted, the Quarry workers would try to keep the road as clean as they could. It is O'Neal's contention that the potholes and rocks that were found in the road were caused by trucks leaving the Quarry filled with stone. This would also explain how stone continuously gathered at this spot of the road. However, according to Fred Jensen, Plant Superintendent of the Quarry, the Quarry does not own or operate trucks for hauling stone out of the Quarry. * * * Moreover, all materials removed from the Quarry are taken away by private individuals or brokers. * * * Therefore, there is no affirmative act of the Quarry to impose liability on it."
This court notes at the outset that in reviewing a summary judgment, we must apply the same standard as the trial court.Lorain Natl. Bank v. Saratoga Apts. (1989), 61 Ohio App.3d 127,129. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). To establish a negligence claim, a party must show the existence of a duty, a breach of that duty, and an injury proximately resulting therefrom. Menifee v. OhioWelding Products, Inc. (1984), 15 Ohio St.3d 75, 77.
The relevant facts to the claim against the quarry are as follows. Fred Jensen, plant superintendent, testified in his deposition that gravel and dust would accumulate on the road outside the quarry exit due to trucks exiting the quarry. He testified that trucks would either drag gravel out with them or the trucks' tailgates would leak. According to Jensen, the trucks were not owned by the quarry, but were operated by individual customers or private brokers. According to Jensen, the condition of the road was checked daily and quarry employees, as needed, would sweep the gravel/stones off the road that accumulated outside the quarry exit. Additionally, quarry employees would water the road to keep the dust down. Occasionally, quarry employees repaired holes at the point where the driveway met the county road, but they would not repair holes out in the road.
Ordinarily, an owner of property abutting a public street is not liable for injuries to pedestrians resulting from defects in the abutting portion of such street. Eichorn v. Lustig's, Inc.
(1954), 161 Ohio St. 11, syllabus. Unless otherwise shown, a public street is under the control of the municipality or public authority. See Eichorn at 13. Eichorn concerned a sidewalk on a public street; however, the law is applicable to adjacent streets as well as sidewalks.
This court has previously recognized three exceptions to this general rule under which a property owner could be held liable: (1) a statute or ordinance imposes a specific duty; (2) if by hisaffirmative acts the property owner created or negligently maintained the defective or dangerous condition that caused the injury; and (3) if he negligently permitted the defective or dangerous condition to exist for some private use or benefit. (Emphasis in original.) Crowe v. Hoffman (1983), 13 Ohio App.3d 254,255-256.
There is no statute imposing a specific duty upon the quarry in this case. As such, we must consider whether the quarry, through its affirmative acts, created or negligently maintained the defective or dangerous condition or, for some private use or benefit, negligently permitted the defective or dangerous condition to exist.
It is clear that an adjacent landowner can only be found liable for injuries resulting from a defective or hazardous condition if the landowner affirmatively caused the condition, as opposed to merely omitting to keep the street in repair.Cavanaugh v. Struthers Bowling Ctr. (1954), 99 Ohio App. 530, 531:
 "In the case of Morris v. Woodburn [(1897), 57 Ohio St. 330], the Supreme Court has made it clear that liability over to the city exists as against an abutting property owner, or, for that matter, against any person, who actively creates a nuisance in the sidewalk as distinguished from one whose negligence
with relation to the defective condition of the sidewalk exists from mere omissions to keep the same in repair. See City of Youngstown v. Peters
[(1937), 60 Ohio App. 247, 254], wherein the authorities are cited." (Emphasis added.)
Moreover, "[a]n abutting owner is not [responsible] for the disrepair of a sidewalk in front of his premises unless its condition is brought about by his wrongful conduct." (Emphasis added.) Eichorn, supra at 13. If, for instance, the street or sidewalk is appropriated for the owner's own private use or benefit, such as installing a trapdoor[1] or coal chute,[2] and he negligently fails to maintain it or permits a defective condition to exist, then the owner is liable for injuries sustained therefrom. See Id. See, also, Purdom v. Sapadin
(1960), 111 Ohio App. 488, 489, ("It is also well established that a property owner is never liable for defects in sidewalks unless they were positively created by the abutting owner, or the owner appropriated a portion of the public walk for his own purposes and then negligently failed to keep that portion of the walk in repair or was guilty of negligence in its original construction." CitingEichorn, supra.) Additionally, the evidence must show that the use of the sidewalk or street which brought about its disrepair was expressly or impliedly authorized by the adjacent property owner.Eichorn at 14.
Normal wear and tear of a street or sidewalk, however, without any "affirmative negligence" by the adjacent landowner, will not create liability for the landowner:
 "* * * In the case of Dennison v. Buckeye Parking Corp. [(1953), 94 Ohio App. 379], the court held that, notwithstanding an ordinance of the city of Columbus, failure of a parking-lot owner to keep his sidewalk in repair did not make him liable for damages to a pedestrian, even though the passage of automobiles over the sidewalk subjected it to more strenuous usage than mere pedestrian traffic. In the opinion in the Dennison case, the court pointed out that to be actionable the defect complained of must be the result of `affirmative negligence' such as `leaving * * * [a manhole] uncovered.'"
Purdom, supra at 489. Even if a landowner's use of the sidewalk may have been more severe than ordinary use, that is only a question of degree and does not create liability for the landowner. Id.
The quarry asserts that the facts in this case are similar to those in Eichorn. The issue in Eichorn concerned a sidewalk that was allegedly damaged as a result of truck activity at the abutting business. In Eichorn, the Ohio Supreme Court reversed the decision of the appellate court and affirmed the judgment of the trial court in favor of the property owner because there was no evidence establishing that the defective condition of the sidewalk was created by any affirmative act or wrongful conduct on the part of the property owner that resulted in the disrepair of the sidewalk. The court focused on the fact that there was a lack of evidence concerning the ownership of the trucks and materials, the relationship between the business and the trucks seen on the sidewalk, and the size of the alleged cracks.
To the contrary, we find that the pertinent facts in this case are not in dispute. The evidence in this case established that the trucks entering and exiting the quarry were not owned by the quarry, but were privately owned by individual customers or brokers who were there to purchase stone from the quarry. The trucks would enter the quarry, get weighed, exit onto Bolander and re-enter to receive stone, get weighed again, and exit the quarry again to depart. When the trucks would exit the quarry, stone would get dragged out into the road by the wheels of the exiting trucks or would be dropped from the trucks' loads.
The quarry asserts that the responsibility for a load rests upon the operator of the vehicle and that whoever loads the vehicle, but does not drive or move it on the highway, cannot be charged with a violation of R.C. 4513.31 which requires that a load be secure. The quarry cites Hurt v. Rogers Transportation Co.
(1952), 66 Ohio Abs. 106, in support of its argument. In Hurt, the plaintiff was injured when a steel forging came through his windshield and hit him in the face. The evidence established that the parts loaded on the truck's bed could slip through the slats of the boxes in which Ford Motor Company loaded the parts. The quarry is correct that Hurt found that the loader of the truck could not be charged with violating the statute which prohibited a vehicle to be driven or moved on any highway unless such vehicle was so constructed or loaded as to prevent any of its load from dropping, sifting, or leaking. However, the court in Hurt
concluded that because there was some evidence that the boxes Ford loaded onto the truck's bed allowed the parts inside to slip out, the judgment notwithstanding the verdict was reversed and plaintiff was awarded judgment against Ford.
Initially, we note that we find that the quarry had no duty to repair any holes or depression in the road that was caused by normal wear and tear of vehicular traffic, albeit very heavy traffic. See Purdom, supra. Upon a thorough review of the evidence, however, we find that the quarry did have a duty to clear the road of gravel in front of its exit drive.
Quarry employees stated that the stone accumulated on the road because the stone and gravel either spilled out of the loaded trucks, or it was drug from the quarry's property onto the road by the trucks. In either case, we find that the quarry affirmatively created the condition that allowed gravel to accumulate on the road. See Eichorn, supra, and Crowe, supra. The quarry filled trucks with loads that were not secure and/or directed these heavy trucks to exit over gravel that was positioned next to the road. Additionally, it is clear that the quarry gained an economic benefit by having the trucks enter and exit its property to purchase and/or transport stone and gravel.
The quarry did undertake the responsibility of checking the road daily, watering down the dust, and clearing off the stone as needed; however, there was an accumulation of stone and gravel on the road at the time of the accident. As such, we find that there is a genuine issue of material fact regarding whether the quarry negligently maintained the roadway.
Accordingly, we find that genuine issues of material fact exist which preclude the granting of summary judgment in favor of the quarry. Appellants' first assignment of error is therefore found well-taken.
Appellants' second assignment of error concerns the granting of summary judgment to Papcun, Ottawa County Engineer, and Arndt, Ottawa County Commissioner ("county appellees). In their motion for summary judgment Papcun and Arndt argued that they were not liable for O'Neal's injuries because (1) the Ottawa County defendants are immune from suit because the conditions on Bolander complained of by plaintiffs did not create a danger for ordinary travel; (2) even if plaintiffs could rebut the presumption of immunity, the county defendants had no notice of the road conditions; and (3) based upon the facts surrounding the accident, reasonable minds could only conclude that the county did not cause the accident.
The trial court granted the county appellees' motion for summary judgment. The trial court held that the county could only be liable if it allowed a condition to exist that created a danger for ordinary traffic on the regularly traveled portion of the road. Finding that the vehicles were drag racing at the time of the accident, the trial court found that Bower's operation of his vehicle was not "ordinary traffic."
Political subdivisions have a blanket immunity from liability for injury to persons caused in connection with a governmental or proprietary function. R.C. 2744.02(A)(1). "Governmental function" includes "[t]he regulation of the use of, and the maintenance and repair of, roads * * *." R.C. 2744.01(C)(2). However, a political subdivision will be liable for injury caused by their negligent failure to keep public roads in repair and free from obstructions. R.C. 2744.02(B)(3). The Ohio Supreme Court held that in determining a political subdivision's duty to keep its roads free of nuisance, "the proper focus should be on whether a condition exists within the [political subdivision's] control that creates a danger for ordinary traffic on the regularly traveled portion of the road."Franks v. Lopez (1994), 69 Ohio St.3d 345, 348, citing,Manufacturer's Natl. Bank of Detroit v. Erie Cty. Road Comm.
(1992), 63 Ohio St.3d 318, 322.
In order to sustain an action against a political subdivision for its failure to keep a roadway in repair and free from nuisance, a plaintiff must establish that the political subdivision had "`either actual or constructive knowledge of the nuisance.'" Id. at 349, citing Vogel v. Wells (1991), 57 Ohio St.3d 91,97. "There is constructive knowledge if `such nuisance existed in such a manner that it could or should have been discovered, that it existed for a sufficient length of time to have been discovered, and that if it had been discovered it would have created a reasonable apprehension of a potential danger * * *.'" Id., citing, Beebe v. Toledo (1958), 168 Ohio St. 203,207.
A political subdivision, however, is immune from liability if the injury resulted from "the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources, unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C.2744.03(A)(5). The Ohio Supreme Court has held that physical impediments such as potholes are easily discoverable and the elimination of such hazards involves no discretion, policy-making or engineering judgment. Franks at 349. "The political subdivision has the responsibility to abate [potholes] and it will not be immune from liability for its failure to do so." Id.
The county appellees asserted in their motion for summary judgment that appellants failed to establish that the "bump" in the road created a nuisance. For purposes of summary judgment, however, based on the affidavit and report of Richard Stevens, accident reconstructionist, who stated that the "combination of the hole in the road, and the accumulated gravel, served to make the traveled portion of the road very hazardous," we find that a genuine issue of material fact exists concerning this issue.
The county appellees also asserted that the county was immune, pursuant to R.C. 2744.03(A)(5), because the maintenance of the road involved the exercise of judgment or discretion and that appellants failed to establish that the county acted with malicious purpose, in bad faith, or in a wanton or reckless manner. However, as stated above, no discretion or judgment is invoked with respect to discovering or eliminating potholes.Franks at 349. Therefore, the county cannot be immune under R.C.2744.03(A)(5).
Hence, the inquiry then becomes, was the county immune from liability because Bower was not engaged in "ordinary traffic on the regularly traveled portion of the road." SeeFranks, supra. Although Bower was on the regularly traveled portion of the road when he lost control, we find that there are genuine issues of material fact regarding whether Bower's operation of his vehicle constituted "ordinary traffic."
According to both Newton and Stevens, Bower was traveling north in the northbound lane. As such, he was in the proper lane of travel for the direction he was heading. Jensen and Newton testified that the cars were going fast just prior to them reaching the quarry exit; however, the estimated range of speed of the vehicles placed them within the speed limit for Bolander Road, which is fifty-five m.p.h. Jensen merely stated the speed of the vehicles was faster than forty m.p.h. and Newton stated the speed was between forty and sixty m.p.h. Accordingly, there was some evidence to establish that the depression was in the road in Bower's lane of travel, that Bower was in the road when he lost control, that he was traveling within the speed limit for Bolander, and that he was in the proper lane of travel. As such, we find that genuine issues of material fact exist regarding whether Bower's operation of his vehicle could be considered "ordinary traffic" at the time he allegedly hit the depression in the road. A jury may determine that Bower was drag racing and, therefore, not engaged in ordinary traffic; however, such an issue is inappropriately decided on summary judgment under the facts in this case.
The county appellees also assert that they had no notice of the alleged nuisance and, therefore, could not be liable. We find, however, that there are genuine issues of material fact in this regard as well.
Long testified that the depression in question and the condition of the road in general had existed the entire ten months he had lived in the area. Long further testified that the condition of the depression had remained the same during that time frame. Fred Jensen also testified that the depression had been in the road for a year or more.
John Biggert worked for Ottawa County mowing grass on Bolander Road in 1994. He testified that he reported the road conditions to his supervisor, Jim Young, but he did not know what actions Young took thereafter.
Ted Peterson, an employee of the Ottawa County highway maintenance garage testified that in 1994 he was a truck driver for the county. He testified that his supervisors, Jim Young and Denny Thompson, would have had to have known that roads adjacent to quarries would require more maintenance.
John Papcun, the county engineer, and James Young, road maintenance superintendent, both testified that they traveled Bolander in 1994. Papcun testified that he would have seen a six inch depression if it had existed for a year because he drives all the roads in the spring and fall. Young testified that he would have driven Bolander around twenty times in that year.
Papcun, Young, and Dennis Thompson, foreman for the road maintenance department, all testified that a depression six inches deep should be patched because it could be unsafe and cause problems with vehicular travel. Young also testified that all potholes get repaired, regardless of size, but that in 1994, because of a drainage project on Bolander, no patching along the berm was to be done until after the project was finished. There was, however, an indication from Papcun that the berm of the road needed "medium" patching in 1994.
Despite the county employees assertions that there were no complaints about the depression or road conditions and that, besides Biggert, nobody from the county was aware of the depression or the road condition, there was clearly evidence to support that the county had either actual or constructive knowledge of the allegedly hazardous road conditions. SeeFranks, 69 Ohio St.3d at 349. A county employee told his supervisor about the road conditions, witnesses testified that the depression existed in the same condition for a minimum of ten months prior to the accident, and the described size of the depression was such that the county would have repaired it because of safety concerns.
Accordingly, we find that reasonable minds could have concluded differently regarding whether the county appellees negligently failed to repair the road and keep it clear of any obstruction or nuisance. Based on the foregoing, we find appellants' second assignment of error well-taken.
On consideration whereof, the court finds substantial justice has not been done the parties complaining and the judgment of the Ottawa County Court of Common Pleas is reversed as to all appellees. This matter is remanded to the trial court for further proceedings in accordance with this opinion. Costs of this appeal to be paid by appellees.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Melvin L. Resnick, J.______ _______________________________ JUDGE
James R. Sherck, J.________ _______________________________ JUDGE
Richard W. Knepper, J._____ _______________________________ JUDGE CONCUR.
[1] See, e.g., Herron v. Youngstown (1940), 136 Ohio St. 190.
[2] See, e.g., Morris v. Woodburn (1897), 57 Ohio St. 330.