VOGEL, ADMR. DE BONIS NON, APPELLEE, *v.* WELLS, APPELLEE; CITY OF AKRON, APPELLANT.

[Cite as Vogel *v.* Wells (1991), 57 Ohio St. 3d 91.]

(No. 89-1662—Submitted October 23, 1990—Decided January 30, 1991.)

*Daniel T. Wilson,* for appellee Walter J. Vogel.

*Harry A. Tipping,* for appellee Vicky L. Wells.

*Max Rothal,* director of law, and *Cheri B. Cunningham,* for appellant.

*Calfee, Halter & Griswold, John E. Gotherman, Stanley J. Dobrowski* and *Thomas P. Pappas,* urging reversal for *amicus curiae* Ohio Municipal League.

WRIGHT, J. This case presents a number of interesting questions for our resolution. These questions involve: the retroactivity of the abrogation of the collateral source rule as to municipalities, the admissibility of evidence on the use and effect of seat belts in accidents predating passage of Ohio's seat belt law, the exclusion of evidence involving an alleged "Mary Carter agreement," the admissibility of evidence involving a videotaped reconstruction of an accident scene, and the propriety of findings of negligence in regard to a municipality's failure to remedy a visual obstruction of a stop sign. While we will resolve each of these questions in turn, we now affirm the decision of the court of appeals.

I

We turn first to the question of whether the trial court properly excluded evidence of a purported "Mary Carter agreement" between one of the defendants, Vicky Wells, and Walter Vogel, administrator of the decedent's estate. "The Mary Carter agreement, named for an early case, * * * [*Booth* v. *Mary Carter Paint Co.* (Fla. App. 1967), 202 So. 2d 8,] is a contract between a plaintiff and one defendant allying them against another defendant at trial. It arises in tort litigation where a plaintiff sues two or more defendants for the same injury." Note, It's a Mistake to Tolerate the Mary Carter Agreement (1987), 87 Colum. L. Rev. 368, 368-369.[1]

Akron contended that certain discussions between Daniel Wilson, Vogel's attorney, A. William Zavarello, Wells's attorney, and Harry A. Tipping, Wells's insurance company's attorney representing Wells, evidenced the existence of a collusive

---

[1] "Mary Carter agreements may incorporate any variety of terms, but are generally characterized by three basic provisions. First, the settling defendant guarantees the plaintiff a minimum payment, regardless of the court's judgment. Second, the plaintiff agrees not to enforce the court's judgment against the settling defendant. Third, the settling defendant remains a party in the trial, but his exposure is reduced in proportion to any increase in the liability of his codefendants over an agreed amount. Some Mary Carter agreements include a fourth element: that the agreement be kept secret between the settling parties. * * *" (Footnotes omitted.) Note, It's a Mistake to Tolerate the Mary Carter Agreement (1987), 87 Colum. L. Rev. 368, 369-370.

agreement between these parties that could bias Wells in her testimony. Thus, Akron moved that it be allowed to disclose to the jury the existence of the purported agreement and to cross-examine Wells to show possible bias on her part, due to her counsel's participation in the purported agreements. After an adequate hearing, the trial court denied this motion, since the court found no potential bias.

At the hearing, Tipping, Wells's insurer's attorney, stated that he had offered the entire $100,000 limit of Wells's insurance policy to Wilson, Vogel's counsel, in settlement of Vogel's claim against Wells. This offer was to remain open until the jury retired to consider its verdict. Wilson stated that his client, Vogel, did not and would not accept the offer. Wilson did, in fact, gratuitously offer to limit his execution upon Wells's property to $100,000, if the jury found her to be negligent to that extent or greater.

It is apparent from the record that the trial court was correct in concluding that whatever effect Tipping's offer may have had, the offer provided an insufficient basis to allow cross-examination on the issue of Wells's possible bias. It is also apparent that Wilson's offer to limit the extent of his potential execution upon Wells's property was unsupported either by consideration or by the consideration substitute of justifiable reliance. We note that Wilson's offer could have been withdrawn at any time. Because there is no evidence of a collusive agreement between any of the parties, and because Wilson's offer, whatever its effect, was completely gratuitous, we find no abuse of discretion and uphold the court of appeals' judgment affirming the trial court's ruling on this issue.

## II

Akron argues that it was improper for the trial court to admit into evidence a videotaped reconstruction of the view of the scene prior to the accident offered by Wells and recorded by an expert within two weeks after the accident.

Akron asserts that the tape was inadmissible because the reconstructed events and the actual events were so dissimilar as to prejudice Akron. It is settled that experiments such as this reconstruction must be performed under conditions substantially similar to the occurrence in issue. *St. Paul Fire & Marine Ins. Co.* v. *Baltimore & Ohio RR. Co.* (1935), 129 Ohio St. 401, 2 O.O. 396, 195 N.E. 861, paragraph one of the syllabus; *Smith* v. *State* (1853), 2 Ohio St. 511. However, "* * * dissimilarities, when not so marked as to confuse and mislead the jury, go to the weight rather than the admissibility of the evidence." *St. Paul Fire & Marine Ins. Co., supra.*

At trial, Thomas F. Baker, production manager for Multivideo Services, Inc., a company specializing in accident reconstruction, testified as an expert witness for Wells and explained his role in videotaping a reconstruction of the view prior to the accident. Baker visited the accident scene accompanied by Wells and other persons on September 20, 1984 and October 3, 1984. Baker mounted a professional quality video camera at eye level immediately beside Wells's head in a Corvette similar to the one Wells had driven on the date of the accident. Baker testified that he had ensured that the conditions depicted on the videotape would appear substantially similar to those on the day of the accident by accurately adjusting for or recreating the proper camera lens aperture setting, camera angle, general sunlight and lighting conditions, and the distance the vehicle was traveling from the curb. After verifying that the camera setup accurately portrayed the scene

as Wells remembered it, Baker videotaped the re-creation through the windshield of the Corvette as Wells drove the vehicle along the route on Wayne Avenue that she had taken on the day of the accident.

Akron utilized its opportunity to cross-examine Baker regarding this videotape recreation. Additionally, Akron was able to present the rebuttal testimony of its own expert, Dr. Arthur Philip Ginsberg, a scientist and business consultant with Vistech Consultants, Inc., who asserted that the videotape recording did not accurately replicate human eyesight.

We hold that it is within the sound discretion of the trial judge to admit or reject evidence of experiments and, absent an abuse of discretion, reviewing courts will not interfere with that decision. *St. Paul Fire & Marine Ins. Co., supra,* at paragraph two of the syllabus. Due to this rule of law, and because Akron had an adequate opportunity to present testimony and cross-examine Wells's expert regarding the credibility that the jury should give to that evidence, we find that the court of appeals was correct in affirming the trial court's ruling.

## III

Akron argues that the trial judge erred in prohibiting Akron from presenting evidence that the decedent failed to wear a seat belt at the time of the accident and that the decedent's injuries were exacerbated because he failed to wear a seat belt. On January 9, 1986, the Ohio General Assembly squarely confronted this issue when it enacted R.C. 4513.263. 141 Ohio Laws, Part I, 49, 73, 81. Subsection (B) of R.C. 4513.263 requires operators and passengers of passenger cars or trucks to wear available occupant-restraining devices. However, Subsection (G)(1) of the statute bars evidence of failure to comply with Subsection (B), except for

the limited purpose of obtaining a conviction for a violation of Subsection (B). Therefore, a passenger's failure to wear a seat belt is inadmissible to show comparative negligence for accidents that occurred on or after May 6, 1986, the effective date of the statute.

The accident in this case occurred on September 18, 1984. The legislature did not specifically give R.C. 4513.263 retrospective application. Thus, that statute cannot determine admissibility of evidence of the decedent's failure to wear a seat belt. *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489, paragraph two of the syllabus. Instead, we must employ the common law in existence prior to the effective date of R.C. 4513.263, to determine the admissibility of this evidence.

The court of appeals relied primarily on two Ohio cases in determining that evidence of the failure to wear a seat belt was inadmissible to show negligence in cases arising before May 6, 1986. In both of these cases, *Schaeffer* v. *Burdette* (1986), 33 Ohio Misc. 2d 12, 14, 514 N.E. 2d 952, 955, and *Roberts* v. *Bohn* (1971), 26 Ohio App. 2d 50, 55-56, 55 O.O. 2d 78, 82, 269 N.E. 2d 53, 58, reversed on other grounds (1972), 29 Ohio St. 2d 99, 58 O.O. 2d 194, 279 N.E. 2d 878, the courts emphasized that the legislature, not the court system, was the appropriate governmental body to determine whether such evidence was admissible to show negligence. The court in *Schaeffer* went on to note:

"* * * [N]either an Ohio court of appeals nor the Supreme Court of Ohio has ever held that there was a non-statutory duty to utilize an available seat belt, nor has any Ohio court held that the principle of mitigation of damages applied to a situation where a plaintiff failed to buckle up. Therefore, even if the new seat belt law were to be applied prospectively only as affecting

substantial rights, the prior case law of Ohio supports the conclusion that evidence of non-use of an available seat belt is inadmissible." *Schaeffer* at 14-15, 514 N.E. 2d at 955.

We find the analysis in *Schaeffer* to be persuasive and so affirm the court of appeals' holding "* * * that the trial court correctly determined that evidence of [the decedent's] failure to use a seat belt was inadmissible for the purposes advanced by Akron."

### IV

Akron argues that the jury's implicit findings that the northeast stop sign on Wayne Avenue was obscured by foliage, creating a nuisance, and that Wells was not negligent in failing to stop at that stop sign were against the manifest weight of the evidence. Thus, Akron contends, the trial court erred when it accepted the verdict based upon these implicit findings.

Ordinarily, an appellate court will not overturn the judgment of a lower court where that court's judgment is supported by some competent, credible evidence going to all the essential elements of the case. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St. 3d 77, 10 OBR 408, 461 N.E. 2d 1273; *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578, syllabus. Therefore, for Akron to prevail on this proposition of law, it must demonstrate that there was no credible evidence upon which the jury could have relied to make its determination regarding the allegedly obscured stop sign and Wells's failure to stop.

We now turn to the jury's finding regarding Wells's failure to stop. Wells presented evidence, in the form of testimony, photographs, and a videotape reconstruction of her approach to the sign, that the stop sign did not become visible until she had come within approximately fifty to seventy-six feet of the sign because tree branches, leaves and solar glare obstructed her view of that stop sign.

She also presented evidence that an automobile traveling at the posted speed limit of twenty-five miles per hour travels at a rate of approximately thirty-seven feet per second. Dr. Merrill J. Allen, a retired Professor of Optometry at the University of Indiana School of Optometry, and certified by boards of optometry in Ohio, Texas, and Indiana, testified that national standards of the American Association of State Highway and Transportation Officials allow two and one-half seconds for drivers' response time. Allen stated that foliage, glare and shadows would have decreased Wells's ability to perceive and react to the stop sign. Allen further testified that the national standard for a minimum acceptable distance for a motorist to react and stop a vehicle traveling at twenty-five miles per hour was approximately one hundred twenty-five feet. Allen concluded that Wells had behaved in a reasonable and normal manner without fault and could not have avoided the accident.

Dr. David L. Uhrich, a Professor of Physics at Kent State University, who was a consultant in accident reconstruction and the designer of the course "Evidentiary Analysis of Traffic Accidents," testified that once Wells perceived the stop sign, it would have taken approximately eight-tenths of a second, in a panic situation, for Wells to begin to apply her brakes. He testified that a driver immediately initiating a panic stop in a car traveling at twenty-five miles per hour would travel approximately sixty-four feet before stopping. Uhrich summarized by stating that Wells did not stop because she did not see the stop sign in question as her view was obstructed by overgrown foliage.

Sufficient conflicting evidence was

presented to the jury on this issue that reasonable minds could have differed regarding whether Wells was negligent in failing to stop. Therefore, it was within the province of the jury to conclude that Wells was not negligent and the trial court did not abuse its discretion in accepting the jury's conclusion. We affirm the court of appeals' holding on this issue.

We turn next to the jury's finding regarding Akron's alleged negligence in maintaining a nuisance by failing to keep the stop sign free from obscuring foliage. Pursuant to R.C. 723.01, a municipality, such as Akron, has a continuing obligation to keep its public highways, streets, and avenues open, in repair, and free from nuisance. On the date of the accident, R.C. 723.01 read:

"Municipal corporations shall have special power to regulate the use of the streets. The legislative authority of a municipal corporation shall have the care, supervision, and control of the public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts, and viaducts within the municipal corporation, and the municipal corporation *shall* cause them to be kept open, in repair, and free from nuisance." (Emphasis added.) H.B. No. 1 (1953).

Thus, a municipality is liable where a condition on a roadway constitutes a nuisance and the municipality has either actual or constructive knowledge of the nuisance and fails to remedy the problem. *Robert Neff & Sons* v. *Lancaster* (1970), 21 Ohio St. 2d 31, 33-34, 50 O.O. 2d 80, 81, 254 N.E. 2d 693, 695. See, also, *Beebe* v. *Toledo* (1958), 168 Ohio St. 203, 60 O.O. 2d 1, 151 N.E. 2d 738, paragraph two of the syllabus; *Kocher* v. *Barberton* (1942), 140 Ohio St. 240, 23 O.O. 439, 42 N.E. 2d 977, syllabus; *Yackee* v. *Napoleon* (1939), 135 Ohio St. 344, 14 O.O. 231, 21 N.E. 2d 111; *Youngs-*town v. *Sturgess* (1921), 102 Ohio St. 480, 132 N.E. 2d 17, paragraph two of the syllabus.

As stated, Wells presented competent, credible evidence that the stop sign was not visible until she had come within fifty to seventy-six feet of the sign. Evidence was also presented that in 1977 the city had trimmed tree branches that obscured the stop sign. It was also apparent from the evidence that the city had no set pattern to maintain or inspect its street signs. In addition, photographs and videotape presented in evidence indicated that the branches obscuring the stop sign must have covered the sign for more than several weeks preceding the accident. It appears that Akron had received sufficient actual or constructive notice of the obscuring foliage to bring the city within the purview of R.C. 723.01, which prohibits Akron from creating or maintaining a public nuisance on the city's streets.

Because reasonable minds could have differed regarding whether Akron had failed to comply with R.C. 723.01 by allowing foliage to obscure the stop sign, it was within the province of the jury to find Akron negligent in creating and failing to remedy this hazard. We affirm the court of appeals' holding on this issue.

V

Lastly, we must deal with the question of whether R.C. 2744.05(B), which abrogates the collateral source rule as to municipalities, may be applied to causes of action that arose before the effective date of the statute, but were not brought to trial until after that date. R.C. 2744.05(B), effective November 20, 1985, reads:

"If a claimant receives or is entitled to receive benefits for injuries or loss allegedly incurred from a policy or policies of insurance or any other source, the benefits shall be disclosed

to the court, and the amount of the benefits shall be deducted from any award against a political subdivision recovered by that claimant. No insurer or other person is entitled to bring an action under a subrogation provision in an insurance or other contract against a political subdivision with respect to such benefits. Nothing in this division shall be construed to limit the rights of a beneficiary under a life insurance policy or the rights of sureties under fidelity or surety bonds."

R.C. 2744.05 was enacted by Am. Sub. H.B. No. 176, 141 Ohio Laws, Part I, 1699, 1716 (the "Act"). Section 5(B) of the Act, *id.* at 1732, as amended by S.B. No. 297, Section 3, 141 Ohio Laws, Part I, 701, 703, effective April 30, 1986, specifically declared R.C. 2744.05 applicable to causes of action which arise after November 20, 1985, and to those which arose earlier but which on that date were "* * * not the subject of a civil action with respect to which a trial has commenced * * *." Thus Section 5 of the Act abrogated the collateral source rule as to causes of action against municipalities that arose before November 20, 1985, but had not been brought to trial by that date.

In applying this law, the trial judge, after a post-trial hearing, reduced the $805,000 verdict by $195,783.28 to account for benefits that the judge found the decedent's estate would receive from collateral sources. Specifically, the court computed this setoff amount by subtracting the amount of funds that the decedent's estate and the decedent's widow and two minor children had received or would receive in Social Security benefits. The court also subtracted the amount of funds the family had received from the decedent's employer and funds the decedent's father had paid for the decedent's funeral expenses.

In order to determine what funds come under the purview of the collateral source setoff provisions of R.C. 2744.05(B), we must first ascertain what the term "benefits" means in relation to the statute. The term "benefits" is nowhere defined in the statute. However, a benefit has been defined elsewhere as "[f]inancial assistance received in time of sickness, disability, unemployment, etc. either from insurance or public programs such as social security." Black's Law Dictionary (6 Ed. 1990) 158. Under this definition, which we adopt here, neither the gift from the decedent's employer nor the payment of funeral expenses by the decedent's father constituted benefits under R.C. 2744.05(B), and the court of appeals was correct in restoring these funds to the decedent's estate.

However, because the funds received from the Social Security Administration are benefits under R.C. 2744.05(B), we must proceed to a constitutional analysis to discern whether a retrospective application of R.C. 2744.05(B) to these benefits violates the prohibition against retroactive laws found in Section 28, Article II of the Ohio Constitution. This court has previously determined that R.C. 2744. 05(B) is constitutional in its *prospective* application to causes of action arising after November 20, 1985, the effective date of R.C. 2744.05. *Menefee* v. *Queen City Metro* (1990), 49 Ohio St. 3d 27, 550 N.E. 2d 181. To determine the constitutional validity of the *retrospective* application of a statute, we utilize a two-step analysis set forth in *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489, paragraphs one and three of the syllabus. See, also, *Viers* v. *Dunlap* (1982), 1 Ohio St. 3d 173, 1 OBR 203, 438 N.E. 2d 881, overruled to the extent inconsistent therewith in *Wilfong* v. *Batdorf* (1983), 6 Ohio St. 3d 100, 6 OBR 162,

451 N.E. 2d 1185, paragraph three of the syllabus, but analysis reaffirmed to the extent not inconsistent therewith in *Van Fossen, supra,* at paragraphs one and three of the syllabus, and at 36 Ohio St. 3d at 108, 522 N.E. 2d at 497.

Under this analysis, the court must initially determine whether the General Assembly specified that the statute was to apply retrospectively. *Id.* at paragraph one of the syllabus. It is clear that the legislature intended to give R.C. 2744.05 retrospective effect, since the legislature specified that R.C. 2744.05 was to apply to causes of action arising before its effective date when trial on a cause of action had not yet commenced.

Because we have passed our threshold inquiry we proceed to our second step and determine whether the statute is substantive or merely remedial. *Id.* at paragraph three of the syllabus. Section 28, Article II of the Ohio Constitution prohibits the legislature from enacting retroactive laws that are substantive rather than merely remedial in their effect. We stated in *Van Fossen* that:

"* * * A statute is substantive when it does any of the following: impairs or takes away vested rights, * * * affects an accrued substantive right, * * * imposes new or additional burdens, duties, obligations or liabilities as to a past transaction, * * * creates a new right out of an act which gave no right and imposed no obligation when it occurred, * * * creates a new right, * * * [or] gives rise to or takes away the right to sue or defend actions at law * * *." *Id.* at 107, 522 N.E. 2d at 496.

The decedent's estate and the survivors became entitled to Social Security funds upon the decedent's death. The court of appeals correctly held that impairing these vested benefits would affect the decedent's estate's and the survivors' substantive rights and would violate Section 28, Article II of the Ohio Constitution. Thus, we uphold the reversal of the trial court's judgment and restoration of the amount by which the judgment had been reduced by setoff.

Section 28, Article II of the Ohio Constitution prohibits the legislature from retroactively applying laws that affect substantive rights. Therefore, the application of R.C. 2744.05(B) to causes of action arising before November 20, 1985, the effective date of the statute, is unconstitutional. *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489, paragraphs one and three of the syllabus, followed.

The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, DOUGLAS, H. BROWN and RESNICK, JJ., concur.

HOLMES, J., concurs in part and dissents in part.

HOLMES, J., concurring in part and dissenting in part. Although I agree with the law set forth by the majority within Sections I through IV of its opinion, I dissent from Section V, in that it is my sincere belief that the portion of R.C. 2744.05(B) which permits reduction of an award is remedial in nature and, therefore, its retroactive application does not violate Section 28, Article II of the Ohio Constitution.

In Ohio, the doctrine of sovereign immunity of political subdivisions, including municipal corporations, resulted from common law. *Haverlack* v. *Portage Homes, Inc.* (1982), 2 Ohio St. 3d 26, 2 OBR 572, 442 N.E. 2d 749. In *Haverlack,* this court abolished the doctrine of sovereign immunity subject, naturally, to the ability of the

General Assembly to limit the liability of Ohio municipal corporations through subsequent legislation. *Id.* at 30, 2 OBR at 575, 442 N.E. 2d at 752. The enactment of Am. Sub. H.B. No. 176, 141 Ohio Laws, Part I, 1699, 1716, effective November 20, 1985, provided a new statutory framework for the liability of municipal corporations.

Sub. S.B. No. 297, Section 3, 141 Ohio Laws, Part I, 701, 703, subsequently amended Am. Sub. H.B. No. 176 to make R.C. 2744.05(B) applicable to causes of action that arose before November 20, 1985, but had not commenced trial before that date.

Section 28, Article II of the Ohio Constitution prohibits the passage of retroactive laws which are substantive in nature. *Kilbreath* v. *Rudy* (1968), 16 Ohio St. 2d 70, 45 O.O. 2d 370, 242 N.E. 2d 658. Within the meaning of this constitutional provision, prohibited retroactive laws are those which create and define substantive rights or which give rise to, or take away, the right to sue and to defend actions at law. *Rairden* v. *Holden* (1865), 15 Ohio St. 207. Section 28, Article II does not apply to laws of a remedial or procedural nature.

No one has a vested right to a particular remedy. *State* v. *Barlow* (1904), 70 Ohio St. 363, 374, 71 N.E. 726, 728; *State, ex rel. Michaels,* v. *Morse* (1956), 165 Ohio St. 599, 60 O.O. 531, 138 N.E. 2d 660.

" 'Remedy' means the action or means given by law for the recovery of a right. It pertains more particularly to those modes of procedure and pleading which lead up to and end in the judgment. A remedy is not a right." *Keplinger* v. *Kinsser* (Montgomery C.P. 1933), 31 Ohio N.P. (N.S.) 338, 342. The legislature has complete control over the remedies afforded to parties and it is a fundamental principle of law that a person may not acquire a vested

right in a remedy or any part of it. *Rairden* v. *Holden, supra; Templeton* v. *Kraner* (1874), 24 Ohio St. 554, 563; *Lawrence RR. Co.* v. *Commrs. of Mahoning Cty.* (1879), 35 Ohio St. 1.

R.C. 2744.05(B) is based on the concept of sovereign immunity. Sovereign immunity does not deny that culpable acts occur, but provides a defense to the payment of damages for such acts. *Haverlack, supra,* at 29, 2 OBR at 575, 442 N.E. 2d at 752. Similarly, R.C. 2744.05(B) does not deny that a municipal corporation may be liable for injuries which it causes; the statute merely limits the damages which the municipal corporation may be required to pay to redress those injuries. By enacting Am. Sub. H.B. No. 176 and Sub. S.B. No. 297, the General Assembly expressed its concern that political subdivisions would be required to use their limited public resources to pay damages for injuries for which plaintiffs had already been compensated from other sources.

In essence, R.C. 2744.05(B) prohibits the application of the collateral source rule against political subdivisions. The collateral source rule is judicially created and provides that, in calculating damages, courts will not consider benefits received from sources other than the tortfeasor. In *Pryor* v. *Webber* (1970), 23 Ohio St. 2d 104, 109, 52 O.O. 2d 395, 398, 263 N.E. 2d 235, 239, this court stated that a purpose of the collateral source rule was epitomized in *Wolfe* v. *Whipple* (1969), 112 Ill. App. 2d 255, 267, 251 N.E. 2d 77, 82, wherein it was observed:

"* * * The entire theory of the collateral source rule is to keep the jury from learning anything about the collateral income *so that it will not .influence the decision of the jury. * * *"* (Emphasis added.)

R.C. 2744.05(B) achieves this purpose, without allowing double recov-

ery, by requiring disclosure of benefits from collateral sources "to the court," not to the jury.

In the case at bar, appellant remains liable and plaintiff-appellee Vogel remains entitled to full compensation for the injuries to his decedent. The application of R.C. 2744.05(B) does not influence the decision of the jury, nor does it prevent the plaintiff from recovering the full amount awarded by the jury which, of course, is intended to fully compensate the plaintiff for the injuries to his decedent.

Again, it must be remembered that the plaintiff will receive full compensation for all injuries, and that at issue is the relative entitlements of the parties to something which, absent the abrogation of sovereign immunity by R.C. Chapter 2744, is not legally due to any of them.

Remedies may be modified, altered or entirely extinguished by legislation even though it is retroactive. *Hatch* v. *Tipton* (1936), 131 Ohio St. 364, 367, 2 N.E. 2d 875, 876. No constitutional prohibition exists in the state of Ohio against the enactment of laws relating to remedy and against applying them to pending actions and existing causes of action. *Smith* v. *New York Central RR. Co.* (1930), 122 Ohio St. 45, 49, 170 N.E. 637, 638; accord, *Westerman* v. *Westerman* (1874), 25 Ohio St. 500, 507; *Gibson* v. *Miller* (1905), 7 Ohio C.C. (N.S.) 96, 28 Ohio C.C. 28, 18 Ohio C.D. 28; *Guernsey Cty. Commrs.* v. *Black* (1911), 25 Ohio C.C. (N.S.) 415, 34 Ohio C.C. 164, 24 Ohio C.D. 164. The General Assembly cannot create a liability for acts to which no liability attached when they were committed, but where a remedy exists, the General Assembly may change it, and if a liability exists, the form of the remedy may be changed. *Lawrence RR. Co., supra,* at 7-8; *Wade* v. *Kimberly* (1891), 5 Ohio C.C. 33, 3 Ohio C.D. 18.

If the statute is applied in the case at bar, the plaintiff will recover the full $805,000 as awarded by the jury. Plaintiff's right to receive the collateral benefits is not affected by R.C. 2744.05(B). Plaintiff is entitled to collect those benefits as fully as if R.C. 2744.05(B) had never been enacted. It is only when the plaintiff seeks recompense from the public treasury in addition to the collateral benefits that R.C. 2744.05(B) applies.

This court stated in *State, ex rel. Slaughter,* v. *Indus. Comm.* (1937), 132 Ohio St. 537, 542, 9 N.E. 2d 505, 508, "[a] fundamental distinction exists between a law changing accrued rights and a law which changes the remedy for the enforcement of those rights." In this case plaintiff's right is to full compensation. That right has been quantified by a jury at $805,000. Only the remedy by which the plaintiff receives his right has changed. Clearly, the application of R.C. 2744.05(B) is remedial in nature and does not affect the plaintiff's substantive rights.

In determining the state's policy with regard to these matters, the General Assembly has reasonably balanced the state's interest in ensuring the continued financial ability of political subdivisions to provide essential services, against the interest of an injured party in being fully compensated. The enactment of Am. Sub. H.B. No. 176 is the means by which the state has attempted to accomplish this policy. R.C. 2744.05(B) affords a party injured by a municipal corporation an alternate remedy without affecting the existing right of the party to collect the full award of the jury. The application of R.C. 2744.05(B) is remedial in nature and does not affect the plaintiff's substantive rights. Therefore, retroactive application of R.C. 2744.05(B) does not violate Section 28, Article II of the Ohio Constitution.