DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a Scioto County Common Pleas Court, Domestic Relations Division, judgment that granted a divorce to Linda L. Jacobs, plaintiff below and appellant herein, and to Norman M. Jacobs, defendant below and appellee-cross-appellant herein. Appellant assigns the following errors for our review:
FIRST ASSIGNMENT OF ERROR:
"THE TRIAL COURT'S DETERMINATION OF THE VALUE OF PORTSMOUTH RADIOLOGY INC. (PRI) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND AN ABUSE OF DISCRETION[.]"
SECOND ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO FIND THAT DR. JACOBS HAD COMMITTED FINANCIAL MISCONDUCT PURSUANT TO R.C. § 3105.171 AND THEREFORE FAILED TO PROPERLY COMPENSATE MRS. JACOBS WITH A DISTRIBUTIVE AWARD OR WITH A GREATER AWARD OF MARITAL PROPERTY[.]"
 {¶ 2} Appellee-(and cross-appellant) posits the following cross-assignments of error:
FIRST CROSS-ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED IN FINDING THAT A 2000 PORSCHE PURCHASED FROM $84,393.94 OF MARITAL FUNDS, IN BOTH PARTIES' NAME AND TITLED IN BOTH PARTIES' NAME WAS A GIFT, AND HENCE, THE WIFE'S SEPARATE PROPERTY."
SECOND CROSS-ASSIGNMENT OF ERROR:
"WHEN THE WIFE OFFERED NO EVIDENCE TO THE CONTRARY, THE TRIAL COURT ERRED IN FINDING THAT CERTAIN REAL PROPERTY OWNED BY THE HUSBAND PRIOR TO THE MARRIAGE, SOLD DURING THE MARRIAGE, AND THE SEPARATE PROCEEDS OF $65,656 USED FOR RENOVATIONS TO THE MARITAL HOME WERE NOT `TRACED.'"
 {¶ 3} The parties met in the early 1980s when appellant was a clerical worker in the pathology lab of a Portsmouth hospital and appellee was a radiologist who practiced with Portsmouth Radiology, Inc.[1] The parties married in 1986 and two children were born as issue of that marriage. During the course of their marriage, each party had difficulty with the way the other handled money. Appellant objected to her husband's investments and appellee objected to what he perceived as his wife's extravagant spending.
 {¶ 4} Appellant commenced the instant action on February 28, 2000 and asked for legal separation, title to all their real and personal property, sole custodial rights over their children and permanent child and spousal support. Appellee denied that he and his wife were incompatible and he asked that her complaint be dismissed. In response, appellant filed an amended complaint for divorce that alleged not only incompatibility, but also gross neglect of duty and extreme cruelty. Again, appellant asked to (1) be awarded all title and interest to their real estate, personal property and household effects; (2) be named sole custodial and residential parent for the minor children; and (3) be awarded permanent child and spousal support. This time, while denying his wife's grounds for divorce, appellee filed a counterclaim for divorce on grounds of gross neglect and extreme mental cruelty. Appellee asked for an equitable division of assets and to be named residential parent of their children under a shared parenting plan.
 {¶ 5} The matter wound its way through extensive pre-trial proceedings and, eventually, came on for hearing over several days during the spring and summer of 2001. Based on testimony adduced at those hearings, as well as the parties' numerous stipulations, the trial court filed a lengthy and detailed decision on April 8, 2002 and granted the parties a divorce on grounds of incompatibility. The court also rendered an extensive analysis of their property and distributed assets totaling $1,512,433 to appellant and assets totaling $1,697,108 to appellee. To further equalize that distribution, the court ordered appellee to pay his ex-wife the sum of $92,237.50.[2]
 {¶ 6} Insofar as custody was concerned, the court adopted a proposed shared parenting plan and designated appellant as the residential parent "for school purposes." The court ordered appellee to pay child support and to pay spousal support in decreasing increments over five years. The trial court filed its judgment on June 24, 2002, and this appeal followed.
 I {¶ 7} Appellant's first assignment of error involves the valuation of appellee's ownership interest in Portsmouth Radiology, Inc. At the outset, we note that the valuation of property in a divorce case is a question of fact. Thus, the issue is subject to review under a manifest weight of the evidence standard. See Brown v. Brown, Pike App. No. 02CA689, 2003-Ohio-304, ¶ 13; Cole v. Cole (Dec. 15, 2000), Jackson App. No. 00CA3; Rinehart v. Rinehart (May 18, 1998), Gallia App. No. 96CA10. Consequently, the trial court's judgment will not be reversed as long as it is supported by some competent and credible evidence. SeeShemo v. Mayfield Hts. (2000), 88 Ohio St.3d 7, 10, 722 N.E.2d 1018,1022; Vogel v. Wells (1991), 57 Ohio St.3d 91, 96, 566 N.E.2d 154, 159;C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279,376 N.E.2d 578, at the syllabus. This standard of review is highly deferential and even "some" evidence is sufficient to sustain the judgment and to prevent a reversal. See Barkley v. Barkley (1997),119 Ohio App.3d 155, 159, 694 N.E.2d 989, 992; Willman v. Cole, Adams App. No. 01CA725, 2002-Ohio-3596, ¶ 24; Simms v. Heskett (Sep. 18, 2000), Athens App. No. 00CA20. With those principles in mind, we turn our attention to the evidence adduced below.
 {¶ 8} Although the record is somewhat unclear as to the specific details of Portsmouth Radiology, Inc., the entity itself appears to have five equal shareholders (appellee and four other radiologists) but few, if any, tangible physical assets. Appellee testified that the corporation did not "own anything" except for its accounts receivable.
 {¶ 9} The only evidence going to the actual value of the company appears to have come from Richard Ferguson, a CPA and certified evaluation analyst, who testified that the book value of appellee's share of the corporation was $35,800. Apparently, the outstanding accounts receivable were not factored into that book value. Ferguson further explained that the true value of appellee's ownership interest could only be calculated by combining that book value with his pro-rata share of the collectable accounts receivable which the witness stated totaled $164,382.
 {¶ 10} Wendy Hanna, who is employed by Comprehensive Medical Practice Management, Inc. (which does the billing/collection of accounts for Portsmouth Radiology, Inc.), provided additional evidence concerning accounts receivable. Hanna's affidavit concluded that appellee's pro-rata share of the accounts receivable totaled $89,624.80 before taxes. The witness arrived at this figure by taking all of the outstanding accounts receivable, subtracting those over 120 days past due, applying an "historical net collection" rate of 34.8% and then arriving at a "collectible accounts receivable" which she divided by the number of shareholders. Hanna gave no opinion as to the book value of appellee's share of the company.
 {¶ 11} In its April 8, 2002 decision, the trial court apparently found Hanna's affidavit to be persuasive. The court allocated to appellee as his distributive share of property the "Portsmouth Radiology, Inc., Accounts Receivable" in the amount of $42,853. While this amount differed from the figure arrived at by Ferguson or Hanna, the trial court, in arriving at its valuation, essentially adopted Hanna's analytical process. The court explained its reasoning as follows:
"During most of the term of this marriage, Dr. Jacobs has been employed by Portsmouth Radiology, Inc. Effective the end of June of 2001, a new corporation was formed for whom Dr. Jacobs will be employed called Southern Ohio Radiology, Inc. Portsmouth Radiology, Inc. Will survive for a period of one (1) year from that date solely in an effort to collect accounts receivable and during which time they will also incur expenses in doing so. Portsmouth Radiology owns only the accounts receivable. They do not own any equipment and there is no other value of this business. The Court finds that the current accounts receivable owed to Portsmouth Radiology, Inc., was $1,287,191.00. Of this amount, only 34.8% historically has been collected. Based on the history of collections, Portsmouth Radiology, Inc. will, therefore, collect $447,942.00 of the current accounts receivable. From that amount, there is a collection fee of 9-½% to 10%. The Court calculated the collection fee at 9.75% for a total fee of $43,674.00. This would leave accounts receivable that Portsmouth Radiology, Inc., will receive in the sum of $404,268.00. Dividing this amount by the five (5) physicians entitles each physician to receive the sum of $80,854.00. Dr. Jacobs will receive this amount and after paying taxes at the rate of 47%, will receive a net amount of $42,853.00."[3]
 {¶ 12} The final figure of $42,853 was carried over into the June 24, 2002 judgment. Appellant argues that this constitutes error for two reasons. First, she asserts that the trial court should have assigned a value for appellee's entire ownership interest in the corporation, rather than his pro-rata share of the accounts receivable. Second, even if the value of his ownership interest was his pro-rata share of the accounts receivable, appellant contends that the court erred by basing its calculations on the "current accounts receivable" as computed by Hanna rather than basing it on the total accounts receivable. We agree with both contentions.
 {¶ 13} "Marital property" includes any personal property acquired during the course of the marriage. R.C. 3105.171(A)(3)(a)(i). Though the record is not entirely clear on this point, it appears that appellee became a shareholder in Portsmouth Radiology, Inc. during the course of his marriage to appellant.[4] Thus, his stock in that company is marital property.[5]
 {¶ 14} Ohio law requires that marital property be divided equitably between spouses. Id. at (B). This requires, in most instances, that such property be divided equally. Id. at (C)(1). If, however, equal property division would produce an inequitable result, property must then be divided in such a way as the court determines to be equitable. Id. In the case sub judice, the trial court took great pains to achieve an equal distribution of marital property. Although the court intended to allocate to appellee his entire interest in Portsmouth Radiology, Inc., it nevertheless made distributions of other property to appellant, and ordered that a cash payment be made to her, to equalize the distribution. We find no error in the trial court's overall distribution scheme and, in fact, commend the court on its painstaking attention to detail in crafting an equitable distribution of property. Where we disagree with the trial court, however, is in its selection of accounts receivable to represent appellee's ownership interest in the corporation. A corporation and its shareholders are separate entities. See Star Bank, N.A. v. Matthews (2001), 144 Ohio App.3d 246, 254,759 N.E.2d 1274; State v. Wiley (May 23, 2002), Licking App. No. 01CA11;Professional Corp. Management Co., Inc. v. Video Connection, Inc. (Sep. 30, 1998), Lucas App. No. L-97-1438. Appellee did not own any of the accounts receivable owed to Portsmouth Radiology, Inc. Rather, he owned shares of stock in the corporation which, in turn, owned those receivables. The marital property that should have been valued, and then allocated to appellee, was the company stock, not the value of the accounts receivable.
 {¶ 15} We acknowledge that the trial court found that Portsmouth Radiology, Inc. had "no other value" to it other than the accounts receivable. Thus, the court treated appellee's pro-rata share of those receivables as representing the value of his stock. We disagree with that approach. First, we find no evidence in the record to support the court's finding that the receivables were the only corporate assets. We note that appellee did testify that Portsmouth Radiology, Inc. did not "own anything" other than the receivables. However, we interpret that statement to mean that the company did not own any tangible physical assets like office equipment or supplies.[6] We do not interpret such testimony as meaning that the company did not have any intangible assets. Moreover, even if that is what appellee intended, it is not clear that he possessed the accounting background to make that type of representation.
 {¶ 16} We also point out that one of appellant's exhibits was a balance sheet prepared by Reynolds Company, Certified Public Accountants, which showed the Portsmouth Radiology, Inc. had a variety of assets beyond their receivables (including "temporary investments" and "prepaid taxes") as well as equity in the form of retained earnings.[7]
While the trial court would have been well within its province as the trier of fact to have placed little weight on that evidence, or even to disregard it completely as not credible, the court would still need to base its decision on some evidence in the record that the company had "no other" value other than its receivables. We have reviewed the evidence in the voluminous record of this case and find nothing to substantiate that the company had no value beyond its receivables.
 {¶ 17} We also believe that using the value of the receivables as the measure of appellee's ownership interest does not take into consideration any costs or expenses incurred by the corporation that are deductible from the income generated by those receivables. A revenue statement prepared by Reynolds Company reveals various overhead costs and expenses paid by Portsmouth Radiology, Inc. These expenses should be accounted for in computing the value of appellee's ownership interest, but are not taken into account if his pro-rata share of company receivables is used as the gauge to measure the value of his stock.
 {¶ 18} We also agree with appellant's contention that even if the value of appellee's ownership interest in the company was based solely on the value of his pro-rata share of the corporate receivables, the trial court erred in using the "current accounts receivable" figure derived in the Hanna affidavit. This figure was arrived at by taking accounts receivable due as of March 31, 2001, ($2,361,819) and subtracting those "over 120 days" past due (45.5%). This provided a "current" receivables amount of $1,287,191 (which was used by the trial court in its calculations). To that figure, Hanna and the trial court applied an "historic collection rate" of 34.8% to arrive at what was presumed to be a "collectible accounts receivable" figure. Hanna computed this historic collection rate from the following table in her affidavit:
"Month Charges Net Payments
April 00 $888,362 $268,259
April 00 $888,362 $268,259
May 00 $869,581 $308,060
June 00 $813,980 $282,848
July 00 $763,590 $305,523
August 00 $848,582 $276,741
September 00 $839,671 $237,914
October 00 $842,230 $307,781
November 00 $910,016 $248,713
December 00 $803,519 $307,538
January 01 $908,688 $309,899
February 01 $918,319 $353,654
March 01 $884,275 $375,727
Total $10,290,813 $3,582,657
Historical Net Collection % 34.8%"
 {¶ 19} The problem with applying the historic net collection rate to "current accounts receivable" is that it double counts the 120 day period for which the company has the most trouble collecting past due bills. That time period is first used in subtracting the 45.5% of receivables that are over 120 days past due and then is used a second time to calculate the historic net collection rate beyond November 2000. Both Hanna and Ferguson applied an historic collection rate of 34.8% to receivables and, thus, we have no problem accepting that figure. However, only Hanna applied that figure to "current account receivables" rather than to the total receivables due and owing. There could well be some Generally Accepted Accounting Principle (GAAP) to allow for this, but no such reason appears in the record. Absent some sort of expert explanation, we agree with appellant that this appears to constitute "double dipping" and is thus an improper method to value the receivables.
 {¶ 20} Accordingly, based upon the foregoing reasons, appellant's first assignment of error is hereby well taken and sustained.
 II {¶ 21} Appellant argues in her second assignment of error that the trial court erred by not finding that her ex-husband perpetrated financial misconduct and then compensating her accordingly. We disagree with appellant.
 {¶ 22} If a spouse engages in financial misconduct, including the dissipation, destruction, concealment, or fraudulent disposition of assets, a court may compensate the offended spouse with a distributive award or with a greater award of marital property. R.C. 3105.171(E)(3). The decision of whether to make an award under this statute is reviewed for an abuse of discretion. Donnelly v. Donnelly, Greene App. No. 2002-CA-53, 2003-Ohio-1377, ¶ 4; Hissa v. Hissa, Cuyahoga App. Nos. 79994 79996, 2002-Ohio-6313, ¶ 45; Gallo v. Gallo, Lake App. No. 2000-L-208, 2002-Ohio-2815, ¶ 43. An abuse of discretion is more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. See Landis v.Grange Mut. Ins. Co. (1998), 82 Ohio St.3d 339, 342, 695 N.E.2d 1140;Malone v. Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440, 448,659 N.E.2d 1242; State ex rel. Solomon v. Police Firemen'sDisability Pension Fund Bd. of Trustees (1995), 72 Ohio St.3d 62,64, 647 N.E.2d 486. In applying the abuse of discretion standard, appellate courts are admonished that they are not to substitute their judgment for that of the trial court. See State ex rel. Duncan v.Chippewa Twp. Trustees (1995), 73 Ohio St.3d 728, 732, 654 N.E.2d 1254;In re Jane Doe 1 (1991). 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181;Berk v. Matthews (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301. Indeed, to show an abuse of discretion, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias. Nakoff v. Fairview Gen. Hosp. (1996), 75 Ohio St.3d 254, 256,662 N.E.2d 1; also see Bragg v. Hatfield, Vinton App. No. 02CA567,2003-Ohio-1441, ¶ 22.
 {¶ 23} Appellant argues that her ex-husband perpetrated two types of financial misconduct. First, she asserts that he "lost hundreds of thousands of dollars in erratic stock tradings and poor investments immediately prior to and during the divorce proceedings." We are not persuaded. The financial misconduct statute should apply only if the spouse engaged in some type of "wrongdoing." Rinehart, supra; Hammond v.Brown (Sep. 14, 1995), Cuyahoga App. No. 67268. There must be a clear showing that the offending spouse either profited from the alleged misconduct or intentionally defeated the other spouse's distribution of assets. Wideman v. Wideman, Wood App. No. WD-02-30, 2003-Ohio-1858, ¶ 34; Detlef v. Detlef (Dec. 14, 2001), Lucas App. No. L-00-1137. We note that investing, even poor investing, is neither wrongdoing nor financial misconduct and we will not construe the statute so broadly as to include investment mistakes. There is no doubt appellant is an aggressive investor (both in the stock market and in real estate) and that he has lost money in some of his investments. There is no evidence, however, that the investment losses were purposely incurred. Every indication is that appellee suffered just as much loss as his ex-wife.[8]
 {¶ 24} Appellant also contends that her ex-husband did not provide "proper documentation to account for the whereabouts" of some of their marital funds during the hearings below. We agree that appellee did not always provide sufficient documentation concerning the transfer of marital funds and that he was sometimes less than precise in pinpointing the location of those funds. This does not mean, however, that financial misconduct occurred. As the voluminous record in this case clearly demonstrates, the parties have considerable financial assets and those assets are deposited in numerous bank accounts, brokerage accounts and other assets. While appellee may indeed be an exceptional radiologist, his record keeping skills are obviously not quite as developed. This, however, is not evidence of financial misconduct.
 {¶ 25} We emphasize that the burden of proving financial misconduct for purposes of R.C. 3105.171(E)(3) is on the complaining spouse. Hvamb v. Mishne, Geauga App. No. 2002-G-2418, 2003-Ohio-921, ¶ 15; Euler v. Euler, Wood App. No. WD-01-063, 2002-Ohio-5199, ¶ 21; Seybert v. Seybert (Dec. 14, 2001), Trumbull App. No. 99-T-119. The trial court apparently concluded that appellant did not carry her burden to establish financial misconduct. We find no error in that decision, let alone an abuse of discretion. Thus, we hereby overrule appellant's second assignment of error.
 III {¶ 26} Appellee's first cross-assignment of error goes to the trial court's disposition of an automobile. On December 18, 1999, the parties purchased a Porsche Cabriolet for $84,393.95.[9] Although both of their names appeared on the purchase invoice, and the car title, appellant argued that the vehicle was a Christmas gift from her husband and should be treated as separate property. Appellee argued that the vehicle was not a gift, but was purchased as a joint car and should be treated as marital property. Each side presented conflicting evidence but, in the end, the trial court found that the Porsche was intended as a gift to appellant and should be treated as separate property. Appellee argues that this constitutes error. We disagree.
 {¶ 27} Our analysis begins from the premise that marital property does not include "separate property." R.C. 3105.171(A)(3)(b). Generally speaking, "separate property" is not divided between spouses, but is disbursed to the spouse who owns it. Id. at (D). "Separate property" includes gifts of personal property made to a spouse during the course of the marriage. Id. at (A)(6)(a)(vii). Property given to one spouse, whether by the other spouse or by a third person, is presumed to be marital property unless shown otherwise by clear and convincing evidence. See Barkley, supra at 168-169; Matic v. Matic (Jul. 27, 2001), Geauga App. No. 2000-G-2266.
 {¶ 28} A trial court's determination whether property is a gift, like any other factual determination, will be upheld as long as it is supported by some competent and credible evidence. Barkley, supra at 169.[10] Appellant gave the following testimony concerning the purchase of this vehicle:
"Q. * * * In December of 1999, the family purchased a Porsche, is that correct?
A. That's correct.
* * *
Q. Was it a joint purchase or, strike that. What was your understanding of why Dr. Jacobs bought the vehicle?
A. It was my understanding that it was supposed to have been a Christmas gift."
 {¶ 29} Bobbie Jo Carver, appellant's niece, testified that appellee referred to the Porsche as "the gift he had bought for Linda for Christmas." Judith Gilland, who "baby sat" for the Jacobs family for years, related the following testimony about the car:
"Q. Did you hear conversations by Mr. Jacobs regarding what, why he purchased the Porsche?
Y. Yes.
Q. What did he say?
A. Do I have to say this?
Q. Yes.
A. Well this what you told me Norman, he said `Now how many people get a Porsche for Christmas as a Christmas gift?' I said, `Well I don't know of anybody.' He said, `Well, Linda is getting one but she wants it before Christmas.' * * *"
 {¶ 30} We acknowledge that appellee testified that the Porsche was not intended as a gift. The evidence was also uncontroverted that both names appeared on the purchase invoice and the car title. Appellee did concede, however, that his ex-wife "could have gotten [the] impression" that the car was a gift and that he may have told other people it was a gift. He further admitted that he had the car salespeople put a large "bow" on the vehicle as if it were a gift.
 {¶ 31} In its April 8, 2002 decision, the trial court carefully weighed this evidence and concluded the Porsche was a gift and, hence, appellant's separate property. We find no error in that decision. Weight of the evidence and credibility of witnesses are issues to be determined by the trial court as the trier of fact. See Cole v. Complete AutoTransit, Inc. (1997), 119 Ohio App.3d 771, 777-778, 696 N.E.2d 289; GTETelephone Operations v. J H Reinforcing Structural Erectors,Inc., Scioto App. No. 01CA2808, 2002-Ohio-2553, at ¶ 10; Reed v.Smith (Mar. 14, 2001), Pike App. No. 00CA650. The underlying rationale for deferring to the trier of fact on matters of evidence weight and credibility is that the trier of fact is better able than an appellate court to view the witnesses and observe their demeanor, gestures, and voice inflections and use those observations in weighing credibility.Myers v. Garson (1993), 66 Ohio St.3d 610, 615, 614 N.E.2d 742; SeasonsCoal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. Thus, the trial court was free to believe all, part or none of the testimony of any witness who appeared before it. Rogers v. Hill (1998),124 Ohio App.3d 468, 470, 706 N.E.2d 438; Stewart v. B.F. Goodrich Co.
(1993), 89 Ohio App.3d 35, 42, 623 N.E.2d 591; also see State v. Nichols
(1993), 85 Ohio App.3d 65, 76, 619 N.E.2d 80; State v. Harriston (1989),63 Ohio App.3d 58, 63, 577 N.E.2d 1144. In the case sub judice, the court clearly afforded more weight to the evidence that the Porsche was indeed a gift. This was well within its province.
 {¶ 32} Appellant counters that the uncontroverted evidence established that the title to the car was in both names and therefore is marital property. We are not persuaded. R.C. 3105.171(H) explicitly states that holding title to property by both spouses in a form of co-ownership does not determine whether the property is marital or separate. This provision applies to car titles as well as other types of titled property. See e.g. Weber v. Weber (Jun. 30, 1999), Wayne App. No. 2846-M. While the fact that the Porsche was titled in both names was some evidence of whether it was a gift, the title was not dispositive. The trial court found that the vehicle was a gift and we conclude that the evidence fully supports this finding.
 {¶ 33} Appellee counters that the Porsche was not a gift because there was no "delivery" of that gift to appellant. This argument is without merit as the record reveals that appellant drove to Columbus to pick up the car from the dealership. The salespeople at the dealership were, in essence, appellee's agents for purposes of delivery.
 {¶ 34} Appellee also argues that no gift occurred because appellant was under a duty to reveal that she was having an affair before she accepted that gift and because "fidelity" is an "implied condition" for any gift given during marriage. Appellee cites no authority to support either of these propositions and we have found nothing to that effect in our own research. Although we may sympathize with the fact that appellee purchased an expensive automobile while appellant was having a romantic relationship with another man and just months before she filed for separation, to impose implied conditions of "fidelity" and to require spouses to divulge their affairs would re-write both domestic relations law and the law of gifts. This is an issue better left to the Ohio General Assembly or to the Ohio Supreme Court.
 {¶ 35} A closer question is appellee's argument that the gift should be vitiated on account of fraud. The evidence is uncontroverted that appellee asked appellant whether she was having an affair before he bought the Porsche. She denied the allegation. Appellee also stated that he would not have purchased the vehicle had he known of the affair.
 {¶ 36} A completed inter vivos gift may be revoked if shown to have been obtained fraudulently. See 52 Ohio Jurisprudence3d (1997) 67, Gifts, § 38. Generally speaking, the elements of fraud are (1) a misrepresentation, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, (4) with the intent to mislead another to rely on it, (5) justifiable reliance on the misrepresentation, and (6) a resulting injury proximately caused by that reliance. See Gaines v. Preterm-Cleveland, Inc. (1987), 33 Ohio St.3d 54,55, 514 N.E.2d 709; Burr v. Stark Cty. Bd. Of Commrs. (1986),23 Ohio St.3d 69, 491 N.E.2d 1101, at paragraph two of the syllabus.
 {¶ 37} Although the evidence adduced below could support a finding that appellant knowingly made a false representation, and that appellee suffered an injury as a result of the false representation, the evidence is murkier as to the remaining elements. Although appellant denied the affair, it is not clear what her intention was. Moreover, if appellee was suspicious of appellant to begin with, and even asked if she was being faithful, then some question arises whether appellee could justifiably rely on her bare assertion that she remained faithful. Nevertheless, appellee had the burden of proving fraud by clear and convincing evidence. See generally Atlantic Veneer Corp. V. Robbins, Pike App. No. 01CA678, 2002-Ohio-5363, ¶ 14; Rambo v. Moore (Mar. 22, 2002), Montgomery App. No. 19050; Ford v. Star Bank, N.A. (Aug. 27, 1998), Lawrence App. No. 97CA39. Considering the totality of evidence adduced below, we believe the trial court could have properly concluded that the elements of fraud had not been proven. The totality of the evidence also supports the court's conclusion that the Porsche was a gift and not marital property.
 {¶ 38} For all these reasons, we find no merit in appellee's first assignment of error and it is hereby overruled.
 IV {¶ 39} Appellee's second cross-assignment of error concerns the trial court's allocation of the couple's residence to appellee as a part of marital property. It is uncontroverted that prior to the marriage, appellee owned three parcels of real estate — two in West Portsmouth and one in North Carolina. Appellee sold all three properties after he got married. Appellee testified that he used the proceeds from those sales to purchase and to improve the residence that he and his wife purchased on Bussey Road in Wheelersburg after they married. Appellee claimed that the sale proceeds from the three other properties were directly traceable into the marital residence and should be considered his separate property.
 {¶ 40} The trial court ruled otherwise, however. In its April 8, 2002 decision, the court found that it had "not received sufficient evidence to set off part of this real estate as separate property as [appellee] has not adequately traced these monies from the sale of pre-marital real estate to improvements of Bussey Road." The court continued that "[p]robably some of the monies that went into the joint account were used for improvements to the Bussey Road property" . . . but "no evidence has been offered to trace these amounts specifically to the improvements and the Court does not feel that [appellee] has established that the proceeds from the sale of this pre-marital real estate has entirely been used to remodel Bussey Road." Appellee argues that this constitutes error. We disagree.
 {¶ 41} Our analysis begins with the premise that separate property is not distributed as marital property but, instead, is disbursed separately to the party who owns it. R.C. 3105.171(D). Commingling separate property with marital property does not destroy the identity of separate property as separate property unless the separate property is not traceable. Id. at (A)(6)(b). The party seeking to have a asset classified as separate property has the burden of tracing that asset back to separate property by a preponderance of the evidence. Munroe v.Munroe (1997), 119 Ohio App.3d 530, 536, 695 N.E.2d 1155; Peck v. Peck
(1994), 96 Ohio App.3d 731, 734, 645 N.E.2d 1300; Knight v. Knight (Jun. 11, 2001), Washington App. No. 00CA38.
 {¶ 42} We do not dispute that appellee testified that the proceeds from the sale of the three parcels of land were invested into the Bussey Road property. We also do not dispute, as an abstract proposition of law, that appellee's testimony would have been sufficient for the trial court to find that those funds had been adequately traced to separate property. See Eddy v. Eddy, Washington App. No. 01CA20, 2002-Ohio-4345, ¶ 34. As mentioned previously, however, the weight of evidence and the credibility of witnesses are issues for the trier of fact. Cole, supra at 777-778. Thus, the trial court was free to believe all, part or none of appellee's testimony. Rogers, supra at 470; Stewart, supra at 42. We also note that the court was not required to accept appellee's tracing testimony simply because it was uncontroverted. See e.g. Thorntonv. Parker (1995), 100 Ohio App.3d 743, 751, 654 N.E.2d 1282; also seeState v. Phillips (1993), 84 Ohio App.3d 836, 841, 619 N.E.2d 29.
 {¶ 43} The trial court found that although appellee claimed that he used funds from the sale of separate property on the marital residence, appellee had not carried his burden of tracing those funds to his separate pre-marital property. We find no error in that decision. Our review of the transcript confirms that appellee's testimony was somewhat unclear on this point. The transcript reveals the following exchange between appellee and counsel concerning the sale of one of those properties:
"Q. So the net gain, your testimony is the net gain from that sale was how much, $53,000.00?
A. $53,672.00.
Q. Do you know where those funds were deposited?
A. It would have been deposited in our bank account.
Q. You don't have any statements to support that, correct?
A. No.
Q. And it's your testimony though you believe that money was invested in Bussey Road, is that correct?
A. Yes our cost of doing that work was about $130,000 paid for in cash.
* * *
Q. But we don't have a contract or anything to end up showing what you invested in the property?
A. I might have some of that, I have run across some of that information."
 {¶ 44} Appellee gave the following testimony when discussing what happened to another piece of property:
"Q. Now you had thirteen acres of unimproved land as well, right?
A. Correct.
Q. Do you still have that?
A. No.
Q. What happened to that land?
A. We sold it.
* * *
Q. Do you know how much money you received from the closing on that property?
A. Well it was a separate, I'm not sure if the Land Contract was paid off at that time or not or if I just paid the owners to pay it off prior to the closing.
Q. So you don't know where the money went? You don't know if it went into a checking account, savings account.
A. It would have gone into our checking account.
Q. You don't have any statements to show that, correct?
A. No."
 {¶ 45} Appellee gave the following testimony concerning the acquisition of the marital residence:
"Q. Dr. Jacobs, what did you pay for Bussey Road when you purchased it in 1994?
A. It was $175,000.
Q. And where did the down payment come from to purchase the home, do you know?
A. My savings.
Q. When you say your savings you're saying that you had a savings account that existed at that time that was premarital?
A. No, we never had a savings account, a checking account.
Q. So the funds, you drafted a certified check out of your checking account, is that correct?
A. Yes.
Q. In terms of being able to trace it for premarital to 1991, we don't have documents that can show that correct?
A. No."
 {¶ 46} Later, appellee testified he had no doubt that the funds received from sale of his separate property went into the improvement of the Bussey Road property. However, when asked if he had "any ability to actually go back and get all these checking accounts and say this is where we wrote this check out of this precise amount of money," appellee replied that he could not. Having reviewed this testimony, we are not persuaded that appellee could trace these funds. His answers appear somewhat muddled on the point and we do not discount the possibility that they seemed even more muddled to the trial court who could hear and observe appellee's testimony first-hand. We therefore find no error in the trial court's conclusion that appellee did not carry his burden of tracing those funds into separate property. For these reasons, we hereby overrule appellee's second cross-assignment of error.
 {¶ 47} Having sustained appellant's first assignment of error, the trial court's judgment is affirmed in part, reversed in part, and the case is remanded for further proceedings on the limited issue of the value of appellee's ownership interest (stock) in Portsmouth Radiology, Inc. as of the time of the divorce. In making its determination as to value, the court is free to hear additional evidence or to rely on evidence already in the record.
JUDGMENT AFFIRMED IN PART, REVERSED IN PART AND CAUSE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed in part, reversed in part and cause remanded for further proceedings consistent with this opinion. Appellant shall recover of appellee costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Domestic Relations Division, to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Evans, P.J. Kline, J.: Concur in Judgment Opinion.
[1] "Portsmouth Radiology, Inc." is also referred to in the record as "Portsmouth Radiologists, Inc." In order to remain consistent with the name used in the trial court's decision and judgment entry, we will use the first designation rather than the latter one,
[2] A "Revised distribution" was filed on May 15, 2002 that showed assets distributed to appellant totaling $1,414,008.63 and assets distributed to appellee totaling $1,573,761.18. The trial court ordered appellee to pay his ex-wife $79,876.28 to equalize those distributions.
[3] The trial court's adoption of Hanna's analysis is evident by its use of "current accounts receivable." Both Ferguson and Hanna agreed that the total accounts receivable, as of March 31, 2001, were approximately $2,361,000. Hanna then reduced that figure by the receivables more than 120 days past due to arrive at a "current accounts receivable" of $1,287,191 which was the figure adopted by the trial court. Ferguson made no allowance in his computation for accounts more than 120 days past due.
[4] We note that even if appellee became a shareholder prior to his marriage, appreciation of that "separate property" during the course of the marriage would be marital property. See R.C.3105.171(A)(3)(a)(iii).
[5] Appellant testified that he owned "12 shares" of the company.
[6] Indeed, the record indicates that Portsmouth Radiology, Inc. operated out of a hospital and used all of the hospital's equipment in its practice.
[7] We parenthetically note that this balance sheet reveals the company owned equipment in 2001 valued at $14,524.75 with an allowance for depreciation of $14,490.06. This appears to contradict appellee's testimony that the company did not own any physical assets.
[8] We note that not all of appellee's "risky" investments lost money. Several years before the proceedings below, appellee and a local chiropractor started a local internet provider in the Portsmouth area. They each invested $10,000 of their own capital and borrowed $350,000 to start "Zoomnet." They eventually took their company public and it was later purchased by "One Main.com" for $2 million in cash and $2 million in stock. Appellant presumably had no qualms about the outcome of this "risky" investment.
[9] The actual price of the vehicle was $75,500 but, with taxes, title, registration, etc., the total price listed on the invoice was $84,393.95.
[10] The same manifest weight of the evidence standard applies even under the heightened "clear and convincing" burden of proof. See Cydrusv. Houser (Nov. 29, 1999), Ross App. No. 98CA2425; also see State v.Rich (Oct. 30, 2001), Pickaway App. No. 00CA47; State v. Morris (Jul. 18, 2000), Washington App. No. 99CA47.