DECISION AND JUDGMENT ENTRY
{¶ 1} Blaze Building Corporation, Rodette Drilling, Mark Ogg and Williams Ogg appeal the judgment of the Williams County Court of Common Pleas in favor of appellee, Ohio Gas Company. Because we conclude that there was some competent, credible evidence to support the trial court's decision, we affirm.
 {¶ 2} Blaze Building Corporation contracted to construct improvements to tollbooth facilities at Exit 2[1] of the Ohio Turnpike in Williams County, Ohio. It awarded a subcontract to Mark Ogg d.b.a. Rodette Drilling to install new underground sewer lines. Mark Ogg subcontracted the job to his brother, William Ogg dba Advanced Technology Drilling. Appellants contacted the Ohio Utility Protection Service ("OUPS") to have all underground facilities marked in the area to be excavated. OUPS notified Ohio Gas Company, who sent out a service technician, Jason Rockey, to locate any gas lines in the area. A six-inch high pressure gas main ran through the area, underneath the turnpike in a north-south direction. South of the turnpike, the gas line turned to the west. On May 24 or 25, 2001, Rockey marked what he believed was the six-inch line with yellow paint and flags.
 {¶ 3} On May 29, 2001, the day before the excavation, appellants had been informed by Rockey that they needed to locate a six to eight-inch pipe. Appellants dug an inspection hole where they believed the new sewer line would cross the gas line. A three-inch pipe was found approximately five feet down. After digging another two feet down, appellants still did not locate the six-inch line. Appellants assumed that the six-inch pipe was deeper than seven feet and that it was safe to proceed because the sewer line was going to be installed at a depth of approximately three feet. Appellants told Rockey that they had located the line. Rockey looked in the inspection hole but did not see either the three-inch or six-inch pipe because dirt had fallen into the hole.
 {¶ 4} On May 30, 2001, appellants began the horizontal drill to install the sewer line. They had planned to drill 500 feet of the total 1,700 feet project that day. Appellants started drilling to the west of the inspection hole and proceeded about 300 feet east of the hole with a ditch witch that had a boring head with a diameter of four inches. The boring head was replaced with a reamer to widen the drill hole to a diameter of eight inches. A reamer is cone-shaped and has teeth all along its slope and tapers from eight inches at the rear to a four-inch nose. Appellants watched as the reamer was pulled west through the inspection hole. Shortly after the reamer cleared the inspection hole, the machine began to chatter. Thinking they had hit a rock, appellants continued to pull the reamer. Almost immediately, water and dirt began to shoot out from the ground, and the smell of gas was prevalent. It was discovered that the reamer had gouged and punctured the six-inch pipe that appellants had not located. Instead of being deeper than the three-inch pipe as assumed, the six-inch pipe was approximately one foot shallower. Ohio Gas was notified and repaired the six-inch pipe.
 {¶ 5} On April 30, 2002, Ohio Gas filed a complaint against appellants to recover the cost of the repair to the six-inch pipe. The case was tried to the bench on May 5, 2003. The trial court found that appellants had violated their duties under R.C.3781.30(C) and (D) when it continued boring/reaming after striking an underground object within the "notice zone" and awarded Ohio Gas $25,905 in damages.
 {¶ 6} Appellants present the following assignment of error on appeal:
 {¶ 7} "The trial court erred in finding defendants were negligent and that their negligence was the sole proximate cause of the damages sustained by Ohio Gas."
 {¶ 8} In their appellate brief, appellants present four issues for this court to consider:
 {¶ 9} whether the trial court erred in finding that appellants were obligated to locate the six-inch line; (2) whether the trial court erred in finding that the widest part of the back reamer struck the six-inch pipe before the nose struck where the pipe was ruptured;
 {¶ 10} whether the trial court erred in finding appellants negligent when they complied with all the requirements of R.C.3781.25 et seq.; and (4) whether the trial court erred in not finding Ohio Gas negligent when it failed to correctly mark the six-inch pipe and failed to indicate its depth.
 {¶ 11} To establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty and injury resulting proximately therefrom. Mussivand v. David
(1989), 45 Ohio St.3d 314, 318, citing Di Gildo v. Caponi
(1969), 18 Ohio St.2d 125. In Ohio, there is a nondelegable duty imposed on one excavating below ground to inform himself as to whether "underground utility facilities" (i.e. pipes, lines, and the like), exist so as to avoid damaging them. GTE North, Inc.v. Carr (1993), 84 Ohio App.3d 776, 779. R.C. 3781.25 et seq. sets forth a statutory scheme to safeguard underground utility facilities in private improvement projects. Excavators are responsible for notifying OUPS of the location of an excavation site and the date of the excavation at least two days but not more than ten days before an excavation. R.C. 3781.28(A). Once a contractor notifies OUPS of the location of a proposed excavation, it fulfills its duty to inform itself of the location of the underground utility facilities. Ohio Edison Co. v. WartkoConstr. (1995), 103 Ohio App.3d 177, 180. OUPS then sends notice to each utility with an underground facility in the area. R.C.3781.28(B).
 {¶ 12} When notice from OUPS is received, the owner of the underground utility facility has the burden to supply the contractor with accurate information regarding the approximate location of the pipe or line. East Ohio Gas Co. v. KenmoreConstr. Co., Inc. (Mar. 28, 2001), 9th App. Nos. 19567 and 19790. R.C. 3781.29 requires a utility to locate and mark the approximate location of its underground utility facilities at the excavation site within 48 hours of receiving notice. If the utility cannot accurately mark the approximate location, it shallmark the approximate location to the best of its ability,
notify the excavator that the markings may not be accurate, and provide additional guidance as needed. Id. (Emphasis added.) "Approximate location" is defined as "the site of the underground utility facility including the width of the underground utility facility plus eighteen inches on each side of the facility." R.C.3781.25(D).
 {¶ 13} R.C. 3781.30 provides the duty of the contractor during the excavation:
 {¶ 14} "When making excavations, the excavator shall do all of the following:
 {¶ 15} "(A) Maintain reasonable clearance between any underground facility and the cutting edge or point of powered equipment;
 {¶ 16} "(B) Protect and preserve the markings of approximate locations of underground utility facilities until those markings are no longer required for proper and safe excavations;
 {¶ 17} "(C) When approaching underground utility facilities while excavating with powered equipment, require an individual other than the equipment operator, to look for any sign of the underground utility facility;
 {¶ 18} "(D) Conduct the excavation in the vicinity of the underground utility facility in a careful and prudent manner, excavating by hand, if necessary, to determine the precise location of the facility and to prevent damage;
 {¶ 19} "(E) As soon as any damage is discovered, including gouges, dents, or breaks to coatings, cable sheathes, and cathodic protection anodes or wiring, report the type and location of the damage to the utility and permit the utility a reasonable amount of time to make necessary repairs;
 {¶ 20} "(F) Immediately report to the utility and, if necessary, to the appropriate law enforcement agencies and fire departments, any damage to an underground utility facility that results in escaping flammable, corrosive, explosive, or toxic liquids or gas, and take reasonable appropriate actions needed to protect persons and property and to minimize safety hazards until those agencies and departments and the utility arrive at the scene."
 {¶ 21} The trial court found that Ohio Gas provided surface markings for its underground gas lines and that a "notice zone" of 18 inches from either side of the markings was created. It further found that while Advance Technology Drilling denied negligence because the puncture hole was outside the notice zone, Advance Technology Drilling had actually struck the six-inch pipe within the notice zone and continued boring/reaming in violation of R.C. 3781.30(C) and (D).
 {¶ 22} We first note the proposition that we must defer to the trial court as the finder of fact. The trial court was in the best position to view the witnesses, observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. SeasonsCoal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80. Accordingly, a reviewing court will not substitute its judgment for that of the trial court. Id. The decision of the trier of fact, be it the judge or jury, will not be reversed as being against the manifest weight of the evidence as long as it is supported by some competent, credible evidence going to each of the essential elements of the case. C.E. Morris Co. v. Foley Constr. Co.
(1978), 54 Ohio St.2d 279, syllabus; Vogel v. Wells (1991),57 Ohio St.3d 91, 96.
 {¶ 23} Rockey testified that he used a radio detection device to locate the six-inch line and that he marked it with a combination of yellow flags and paint, but some of these markings were covered over by a stone driveway before the inspection hole was dug. He placed the markings in a general north-south direction near the turnpike and then placed them in a southwesterly direction near the excavation site, indicating a turn in the line. Rockey further testified that he could not recall whether he had discussed with William Ogg the depth of the six-inch pipe at the location of the dig but that he did indicate that the six-inch ran deep under the turnpike. Rockey also stated that it is not possible to accurately determine the depth of a line without actually exposing it.
 {¶ 24} Rick Bishop, the safety training manager for Ohio Gas, testified that he went to the excavation site after the six-inch pipe was ruptured. He stated that the damage to the six-inch pipe began nine inches to the east of the puncture hole. Douglas Saul, vice president of operations for Ohio Gas, testified that even if the six-inch pipe had not been punctured but merely gouged, it still would have been necessary to replace the same section of the six-inch pipe because of federal regulations concerning the wall thickness of gas lines.
 {¶ 25} William Ogg testified that Rockey told him that he had trouble locating the six-inch pipe and could not give him a definite depth for the pipe. He stated that appellants opened a window of 24 inches on either side of the three-inch pipe after it was located. He testified he knew that the three-inch pipe was not the size of pipe he was told to look for but that he assumed either Rockey had the size of the pipe incorrect or that the six-inch pipe was deeper than the three-inch pipe. William Ogg testified that he watched as the reamer went through the inspection hole and that the machine began to chatter or shake almost immediately after passing through the hole. William Ogg stated that at the time he believed the reamer had struck a rock. Before he could tell the operator to stop drilling, the gas line had been punctured. He believed the six-inch pipe was just inside the wall of the inspection hole and that when the reamer struck the six-inch pipe it gouged in and turned causing the puncture hole and gouge marks simultaneously. He admitted that based on his own measurements the start of the damage to the six-inch pipe began less than 18 inches from Rockey's mark. The puncture hole, itself however, was 21 inches from the mark.
 {¶ 26} Based on testimony and exhibits, we find that there is some competent, credible evidence to support the trial court's decision. Appellants were required to conduct the excavation in a careful and prudent manner when approaching the approximate location of the underground facility. Appellants were informed that they needed to look for a six-inch pipe. The approximate location of the pipe is defined as the width of the underground facility plus 18 inches on either side for a total "notice zone" of 42 inches. While appellants' witnesses testified that the inspection hole was four feet wide, they could not explain why they did not discover the six-inch pipe that was within 11 inches of Rockey's mark. There is also testimony that the drilling did not immediately stop as soon as the machine started to chatter. While appellants argue that the nose of the reamer punctured the six-inch pipe before it caused any other damage to the pipe and that this all occurred outside the "notice zone," there is some competent, credible evidence otherwise. The evidence shows that a four-inch pilot hole was created without any damage to the six-inch pipe. It was when the pilot hole was being widened on the return trip that there was a problem. The nose of the reamer, being four inches in diameter, would have traveled back through the pilot hole without incident. The rear of the reamer, however, expands to an eight-inch diameter in order to widen the pilot hole. It is logical that the teeth along this expanding cone would have first struck the six-inch pipe, causing the reamer to catch and turn and eventually puncture the pipe.
 {¶ 27} We, therefore, conclude that the trial court's decision was not against the manifest weight of the evidence. Appellants' sole assignment of error is not well-taken. The judgment of the Williams County Court of Common Pleas is affirmed. Costs are assessed against appellants.
Judgment Affirmed.
Pietrykowski, J., Lanzinger, J., Singer, J. concur.
[1] Exit 2 has been renumbered as exit 13.